UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

IGNACIO DUARTE,

                                Plaintiff,

                - against -

91 THROOP LLC,

                             Defendant.

------------------------------------------------ x

Case No. 20 Civ. 5011

**COMPLAINT**

Plaintiff Ignacio Duarte, by his attorneys Brick Law PLLC, as and for his complaint against defendant 91 Throop LLC ("Defendant" or "91 Throop") herein alleges as follows:

## NATURE OF THE ACTION

1.      This is an action to recover the down payment that Defendant (as the purchaser) tendered to the parties' escrow agent in preparing to purchase from Plaintiff (as the seller) real property located at 91-95 Throop Avenue, Brooklyn, New York (the "Property").

2.      The parties signed a written purchase and sale agreement that had been negotiated and prepared with the involvement of counsel for both parties, and each party had the fully-executed agreement over two months before the scheduled closing date.

3.      Time was made of the essence in the agreement, but Defendant willfully failed to close the sale and failed to pay the balance of the purchase price on the closing date (June 2, 2020).

4.      Defendant has no excuse or justification for its breach of the parties' agreement and appears only to have caught a case of buyer's remorse.

5.      After entering into the agreement, Plaintiff reminded Defendant of its obligations to close on the closing date, but Defendant defaulted anyway.

6.      Consistent with common practice, the agreement entitled Plaintiff to retain Defendant's down payment as liquidated damages for Defendant's failure to close the sale of the Property.

7.      Defendant, however, seems unwilling to abide by the agreement in this respect too – making baseless claims that Plaintiff somehow breached the agreement instead (not Defendant) and demanding the return of its down payment.

8.      Defendant's refusal to honor its promises under the agreement now requires this action to enforce Plaintiff's right to receive the down payment as damages for Defendant's breach.  And, because the agreement provides for the recovery of attorney's fees by a "prevailing party," Plaintiff is also entitled to recover his attorney's fees in addition to the down payment.

## PARTIES

9.      Plaintiff Ignacio Duarte is a citizen of the State of Florida.

10.     Upon information and belief, Defendant 91 Throop LLC is a limited liability company organized and existing under the laws of the State of New York with a principal place of business located at 266 Broadway, Suite 403, Brooklyn, New York  11211.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12.     This Court has personal jurisdiction over Defendant 91 Throop LLC pursuant to Rule 4(k) of the Federal Rules of Civil Procedure and Sections 301 and 302 of the New York

Civil Practice Law and Rules because (a) it is a New York limited liability company, (b) its conduct as alleged herein occurred within the State of New York, (c) it has transacted business within the State of New York related to the claims in this action, and (d) it has consented to the personal jurisdiction of this Court in Section 24.16(a) of the Purchase and Sale Agreement.

13.     Venue is proper in this Court pursuant to a forum selection clause in the Purchase and Sale Agreement providing for this action to be brought in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     The Purchase and Sale Agreement

14.     On or about March 4, 2020, the parties entered into a Purchase and Sale Agreement governing Plaintiff's sale of the Property to Defendant (the "Purchase and Sale Agreement").  A copy of the Purchase and Sale Agreement is annexed hereto as Exhibit 1.

15.     Section 2.1 of the Purchase and Sale Agreement contains the agreed upon purchase price of $5,450,000.00.

16.     Section 2.2.1 provides for Defendant to tender a down payment of $450,000.00 (the "Down Payment"), which Defendant provided to Reliable Abstract Co., LLC as the agreed escrow agent (the "Escrow Agent").

17.     The Escrow Agent is currently holding the Down Payment.

18.     Section 23.1.1 requires the Escrow Agent to have deposited the Down Payment "in an interest bearing savings account."  As a result, Section 2.2.1 also provides:

> Any interest earned on the principal portion of the Downpayment shall be deemed to be part of the Downpayment and shall be paid together with the principal portion of the Downpayment; it being understood and agreed that any interest earned on the Downpayment shall not be credited to the Purchase Price upon the Closing and shall, upon the Closing, be and remain the property of Seller.  The Downpayment shall be non-refundable to Purchaser except as set forth otherwise herein.

19.     Section 3 set the closing date for the sale as "10:00 A.M. New York Time on the day that is ninety (90) days following the Effective Date."  The preamble of the Purchase and Sale Agreement makes the Effective Date March 4, 2020, which made the Scheduled Closing Date June 2, 2020.

20.     Section 3 also provided:  "Purchaser [Defendant] acknowledges and agrees that TIME SHALL BE OF THE ESSENCE with respect to the performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price and otherwise consummate the transactions contemplated hereby on the Scheduled Closing Date."

21.     Section 26 of the Purchase and Sale Agreement also provided that time was of the essence:  "The parties hereto acknowledge and agree that, except as otherwise expressly provided in this Agreement, TIME IS OF THE ESSENCE for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents and the funding of money) required or permitted to be taken under this Agreement" (capitalization in original).

22.     Two separate provisions in the Purchase and Sale Agreement provided that time was of the essence for Defendant's obligations to close the sale of the Property.

23.     Section 2.2.2 requires Defendant to have paid the balance of the Purchase Price on the Closing Date.  However, Defendant did not pay the balance of the Purchase Price to Plaintiff on the Closing Date, which was a default under the Agreement.

24.     Section 10.1 describes Plaintiff's options for Defendant's breach of its obligations to pay the purchase price balance and to close the sale of the Property.  Specifically, Section 10.1 provides:

> "If Purchaser shall default in the performance of Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof ( a "Purchaser Default"), Seller shall have the right to elect, as its sole and exclusive remedy, upon written notice to Purchaser, to either:  (a) terminate this Agreement and the

parties hereto shall be released from any further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement or (b) waive Purchaser's Default and proceed to close the transactions contemplated hereby."

Section 10.1 then continues:

> SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DOWNPAYMENT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT.  SUCH LIQUIDATED AND AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.

(Capitalization in original).

25.    In Section 24.2, the parties selected New York law to govern the Purchase and Sale Agreement.

26.    The parties also agreed in Section 24.15 that "[i]f any action is brought by either party against the other in connection with or arising out of this Agreement or any of the documents and instruments delivered in connection herewith or in connection with the transactions contemplated hereby, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred in connection with the prosecution or defense of such action."

27.    Finally, Section 14 governs the delivery of notices under the Purchase and Sale Agreement:  "all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as 'Notices') required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given

when:  (a) personally delivered with signed delivery receipt obtained or (b) upon receipt, when sent by prepaid reputable overnight courier."

**B.**      **Defendant Failed To Close The Sale Of The Property**

28.      On June 2, 2020, Plaintiff was ready, willing, and able to close the sale of the Property, and he had satisfied all of the conditions required for the closing (as described in Section 9.2 of the Agreement).

29.      By contrast, Defendant failed to satisfy all of its conditions to close (as described in Section 9.1 of the Agreement) – specifically, its failure to pay the balance of the Purchase Price and its failure to appear for the closing of the sale (which was made Time of the Essence).

30.      As a result of Defendant's failure to satisfy all of its closing obligations and to close the sale on June 2, 2020, Plaintiff terminated the Agreement in a June 2, 2020 letter sent to Defendant by overnight delivery.  Plaintiff also notified Defendant that it would direct the Escrow Agent to release to Plaintiff the Down Payment (plus all accrued interest).

31.      Plaintiff's June 2, 2020 termination notice satisfied the notice requirements in Section 14 of the Purchase and Sale Agreement and was authorized by Section 10.1.

32.      Nonetheless, the previous day (June 1, 2020), which was the day before the scheduled closing, Defendant sent the Escrow Agent a letter falsely accusing Plaintiff of having breached the Purchase and Sale Agreement and of having "unilaterally modified" the agreement "in a material respect."  Defendant's June 1, 2020 letter then demanded the return of the Down Payment.

33.      Defendant manufactured a baseless claim that Plaintiff materially altered the Purchase and Sale Agreement (which Plaintiff did <u>not</u> do) as a misguided way to evade the

forfeiture of its Down Payment.  Defendant simply did not want to close the sale and concocted a false claim of breach against Plaintiff – a claim that Defendant made only to the Escrow Agent.

34.     It is revealing that Defendant never delivered a notice to Plaintiff informing Plaintiff that he had defaulted under the Purchase and Sale Agreement.  Defendant made this frivolous insistence only to the Escrow Agent, and provided a copy of that letter to Plaintiff.

35.     In response, Plaintiff sent the Escrow Agent a June 2, 2020 letter objecting to any return of the Down Payment to Defendant.  Plaintiff notified the Escrow Agent that Defendant had breached the agreement, and he asked the Escrow Agent for the release of the Down Payment to Plaintiff.

36.     Defendant has continued to object to the release of the Down Payment to Plaintiff.

37.     Defendant's breach of its obligations to close the sale and to tender the balance of the Purchase Price on or before 10:00 a.m. on June, 2, 2020 entitles Plaintiff to possession of the Down Payment – together with his attorney's fees as a prevailing party as authorized by the Purchase and Sale Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

38.     Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein.

39.     Plaintiff and Defendant entered into the Purchase and Sale Agreement on or about March 4, 2020, which was a valid, binding contract governed by New York law.

40.     Plaintiff performed all of his obligations under the Purchase and Sale Agreement. He was ready, willing, and able to close the sale of the Property on June 2, 2020 and to tender ownership of the Property to Defendant.

41.     Defendant breached its obligations under the Purchase and Sale Agreement to tender the balance of the Purchase Price ($5,002,158.14) on the scheduled closing date and to close the sale of the Property.

42.     Because time was made of the essence in two separate provisions of the Purchase and Sale Agreement (including for Defendant's obligations to close the sale and to pay the balance of the Purchase Price), Defendant's breaches as described herein entitled Plaintiff to terminate the Agreement and to recover the Down Payment as liquidated damages.

43.     Plaintiff provided Defendant with proper notice of termination and is entitled to possession of the $450,000 Down Payment plus any accrued interest.

44.     As a direct and proximate result of Defendant's breach of its obligations as described herein, Plaintiff is entitled to liquidated damages in the amount of $450,000.00 together with all accrued interest thereon.

45.     Plaintiff is also entitled to recover his reasonable attorney's fees as a prevailing party under the express terms of Section 24.15 of the Purchase and Sale Agreement.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a))**

46.     Plaintiff repeats and re-alleges each and every one of the foregoing allegations as though fully set forth herein.

47.     As described herein, there is a substantial controversy between Plaintiff and Defendant concerning rightful possession of the Down Payment.  Plaintiff and Defendant have each claimed entitlement to the Down Payment.

48.     Plaintiff and Defendant have adverse legal interests concerning the Down Payment, and each party has claimed entitlement thereto.

49.     The existing controversy between Plaintiff and Defendant is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment determining the parties' respective rights to possession of the Down Payment.

50.     As described herein, Plaintiff is entitled to a determination that he is the rightful owner of the Down Payment because Defendant failed to close the sale of the Property on the scheduled time-of-the-essence closing date.

51.     Because the Escrow Agent is holding the Down Payment, a declaratory judgment would facilitate Plaintiff's rights to the recovery of the Down Payment from the Escrow Agent.

52.     As a direct and proximate result of Defendant's objections to Plaintiff's recovery of the Down Payment (and Defendant's defaults under the Purchase and Sale Agreement), this is a ripe controversy that warrants the issuance of a declaratory judgment, pursuant to 28 U.S.C. § 2201(a), declaring that Plaintiff should be given possession of the Down Payment and all accrued interest thereon.

53.     Plaintiff is also entitled to an award of his reasonable attorney's fees as the prevailing party under the express terms of Section 24.15 of the Purchase and Sale Agreement.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully prays for a judgment granting:

i.      On his First Cause of Action, liquidated compensatory damages in the amount of the Down Payment (including any interest accrued thereon);

ii.     On his Second Cause of Action, a declaratory judgment (a) determining that Plaintiff is entitled to possession of the Down Payment (including any interest accrued thereon), and (b) directing that Plaintiff be given possession of the Down Payment (including any interest accrued thereon);

iii.    Pre-judgment interest at the CPLR statutory rate of nine percent (9 %) *per annum* (beginning June 2, 2020) on the amounts awarded on his First Cause of Action or Second Cause of Action;

iv.    Attorney's fees as the prevailing party (pursuant to Section 24.15 of the Purchase and Sale Agreement), costs, and the expenses related to this action; and

v.    Such other and further relief as the Court deems just and proper.

Dated:    White Plains, New York
          June 30, 2020

                                    Respectfully Submitted,


                                    BRICK LAW PLLC


                                    By: _____/s/   Brian H. Brick_____
                                          Brian H. Brick, Esq.

                                    2 Milford Close
                                    White Plains, New York  10606
                                    (917) 696-3430
                                    brianbrick@bricklawpllc.com

                                    *Attorneys for Plaintiff*

EXHIBIT  1

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "**Agreement**"), made as of March 4, 2020 (the "**Effective Date**"), by and between **IGNACIO DUARTE**, an individual, having an address at 400 S. Pointe Drive, Apt. 2110, Miami Beach, Florida 33139 ("**Seller**"), and 91 Throop LLC, a domestic limited liability company, having an address at c/o Jeffrey Zwick & Associates, P.C., 266 Broadway, Suite 403, Brooklyn, New York 11211 ("**Purchaser**").

## RECITALS:

A.     Seller is the owner of that certain lot, piece or parcel of land located in the Borough of Brooklyn, County of Kings and State of New York, having a street address of 91-95 Throop Avenue, Brooklyn, New York (as more commonly known as Block 2273, Lot 30), as more particularly bounded and described in Schedule A attached hereto and hereby made a part hereof (the "**Land**"), together with the building erected thereon (the "**Building**") and any and all other fixtures and improvements erected thereon (collectively, the "**Premises**"); and

B.     Seller and Purchaser have agreed to the sale by Seller and the purchase by Purchaser of the Premises, on the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements herein contained and subject to the terms and conditions hereinafter set forth, the parties agree as follows:

1.     Agreement to Sell and Purchase.

1.1     Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase from Seller, upon the terms and conditions hereinafter contained, all right, title and interest of Seller in and to: (a) the Premises together with: (i) the land lying in the bed of any street, highway, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, (ii) any rights of way, appendages, appurtenances, easements, sidewalks, alleys, gores or strips of land adjoining or appurtenant to the Land or any portion thereof and used in conjunction therewith, (iii) any development rights appurtenant to the Land or any portion thereof and (iv) any award or payment made or to be made in lieu of any of the foregoing or any portion thereof and any unpaid award for damage to the Land or any of the Improvements by reason of change of grade or closing of any street, road or avenue; (b) all fixtures, machinery, tangible personal property and equipment, including without limitation pallet racks, walkin box (large refrigerators), office and bathrooms used in connection with or attached or appurtenant to or at or upon all or any portion of the Land and the Improvements as of the date hereof (collectively, the "**Personal Property**"); (c) all transferable permits, licenses, registrations, approvals and certificates, if any, held solely for use in connection with all or any  portion of the Premises and (d) all transferable guaranties, warranties and other intangible personal property related to the Premises.

1.2     All of the above enumerated property, rights and interests to be sold to Purchaser pursuant to this Agreement (including, without limitation, the Buildings and Improvements erected on the Land or any part thereof), are hereinafter sometimes collectively referred to as the "**Property**".

2.      Purchase Price.

2.1      The aggregate purchase price for the Property shall be FIVE MILLION FOUR HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($5,450,000.00) (the "**Purchase Price**"), subject to such apportionments, adjustments and credits as are provided herein.

2.2      Purchaser shall pay the Purchase Price as follows:

2.2.1      The sum of FOUR HUNDRED FIFTY THOUSAND AND 00/100 DOLLARS ($450,000.00) (such principal amount, together with any interest earned thereon, is referred to collectively as the "**Downpayment**"), upon the signing of this Agreement, by wire transfer of immediately available federal funds to an account at such bank as designated by Reliable Abstract Co. LLC, as escrow agent ("**Escrow Agent**").  The Downpayment shall be held by Escrow Agent and disbursed in accordance with the terms and conditions of this Agreement. Any interest earned on the principal portion of the Downpayment shall be deemed to be part of the Downpayment and shall be paid together with the principal portion of the Downpayment; it being understood and agreed that any interest earned on the Downpayment shall not be credited to the Purchase Price upon the Closing and shall, upon the Closing, be and remain the property of Seller. The Downpayment shall be non-refundable to Purchaser except as set forth otherwise herein.

2.2.2      The balance of the Purchase Price shall be paid to Seller on the Closing Date (as hereinafter defined), subject to the apportionments, adjustments and credits referenced herein, by federal funds wire transfer of immediately available funds to an account at such bank or banks as shall be designated by Seller to Purchaser (the "**Cash Balance Payment**").

2.3      Purchaser expressly agrees and acknowledges that Purchaser's obligations to pay the Purchase Price and otherwise consummate the transactions contemplated hereby are not in any way conditioned upon Purchaser's ability to obtain financing of any type or nature whatsoever (i.e., whether by way of debt financing or equity investment, or otherwise).  Although there is no financing contingency in this Agreement, and Purchaser acknowledges its obligation to close under this Agreement is not subject to any such financing condition or contingency, Purchaser may nevertheless elect to apply for and obtain financing.  In the event Purchaser applies for financing, Seller hereby agrees in good faith to reasonably cooperate with Purchaser and Purchaser's lender to consummate the transaction with such financing; provided, that such cooperation and such financing shall not result in a delay or postponement of the Closing.

3.      Closing.

The closing of the transaction contemplated hereby (the "**Closing**") shall occur at 10:00 A.M. New York Time on the day that is ninety (90) days following the Effective Date (such date, the "**Scheduled Closing Date**" and the actual date of the Closing, the "**Closing Date**"), at the offices of Norton Rose Fulbright US LLP in New York, New York (or at Purchaser's request, with notice to Seller's attorneys at least three (3) days prior to the Closing Date, by escrow through the Title Company, or at the offices of Purchaser's lender or such lender's attorneys).  Purchaser acknowledges and agrees that **TIME SHALL BE OF THE ESSENCE** with respect to the

performance by Purchaser of its obligations to purchase the Property, pay the Purchase Price and otherwise consummate the transactions contemplated hereby on the Scheduled Closing Date.

    4.    <u>Exceptions to Title; Title Matters</u>.

    4.1    The Property is sold and shall be conveyed subject only to the following matters (collectively, the "**Permitted Exceptions**") provided same do not render title uninsurable:

    4.1.1    All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the Closing Date, subject to adjustment as hereinafter provided.

    4.1.2    All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any (collectively, "**Laws and Regulations**") provided same do not render title to the Premises uninsurable at regular rates without the payment of additional premium.

    4.1.3    All covenants, restrictions and rights and all easements and agreements of record as of the date hereof (or consented to or deemed consented to pursuant to the terms and provisions hereof) for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Property (collectively, "**Rights**").

    4.1.4    Any state of facts that an accurate survey of the Premises would show (collectively, the "**Facts**").

    4.1.5    Intentionally omitted..

    4.1.6    Intentionally omitted.

    4.1.7    Any financing statements filed on a date more than five (5) years prior to the Closing Date and any financing statements, chattel mortgages, encumbrances or mechanics' or other liens filed against property which is not part of the Property provided the title company shall omit.

    4.1.8    All violations of building, fire, sanitary, environmental, housing and similar Laws and Regulations whether or not noted or issued at the date hereof or at the Closing Date (collectively, "**Violations**") provided the Seller shall, at or prior to Closing, pay any and all monetary impositions related to the Violations including but not limited to civil penalties issued by the New York City Department of Buildings.

    4.1.9    Consents of record as of the date hereof (or consented to or deemed consented to pursuant to the terms and provisions hereof) by Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

4.1.10 Possible minor encroachments and/or minor projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Property or any adjoining property. For the purpose of this provision, "minor" shall mean six inches or less.

4.1.11 Minor variations between tax lot lines and lines of record title. For the purpose of this provision, "minor" shall mean six inches or less.

4.2    Purchaser, at Purchaser's sole cost and expense, shall order a title report for the Premises (the "Title Report") from any reputable title company licensed to conduct business in the State of New York (the "Title Company"), within five (5) days after the date of this Agreement. A copy of the title report delivered to Seller's attorney shall constitute Purchaser's notice of title defects with respect to the matters set forth therein which are not Permitted Exceptions and which in fact and in law render title to the Premises uninsurable in accordance with the terms and conditions of this Agreement ("Objections").

4.3    If, on the Closing Date, Seller is unable to convey to Purchaser title to the Property subject to and in accordance with the Objections or provisions of this Agreement, Seller shall be entitled, upon written notice delivered to Purchaser on or prior to the Closing Date, to reasonable adjournments of the Closing one or more times for a period not to exceed sixty (60) days in the aggregate to enable Seller to convey such title to the Property.  If Seller does not so elect to adjourn the Closing, or if at the adjourned date Seller is unable to convey title subject to and in accordance with the provisions of this Agreement, Purchaser shall be entitled, to either: (a) terminate this Agreement by written notice to Seller and Escrow Agent prior to the Closing Date and receive a prompt refund of its Downpayment whereupon this Agreement shall thereupon be deemed terminated and of no further effect, and neither party hereto shall have any obligations to the other hereunder or by reason hereof, except for the provisions hereof that expressly survive termination of this Agreement or (b) complete the purchase with such title as Seller is able to convey on the date, as applicable, that is either five (5) Business Days after the Closing Date if Seller does not elect to adjourn the Closing or five (5) Business Days after the adjourned date of the Closing if Seller does elect to adjourn the Closing with a reduction of the Purchase Price in an amount equal to the Removal Amount (as hereinafter defined).  If Seller elects to adjourn the Closing as provided above, this Agreement shall remain in effect for the period or periods of adjournment, in accordance with its terms.  Purchaser shall make its election between clauses (a) and (b) of the second sentence of this Section 4.3 by written notice to Seller given not later than the fifth (5th) Business Day after notice by Seller to Purchaser of Seller's inability or unwillingness to remove any objection(s) to title.  If Purchaser shall fail to give such notice as aforesaid, Purchaser shall be deemed to have elected clause (b) above and the Closing shall take place on the date described in clause (b).   Notwithstanding anything to the contrary contained in this Agreement, Seller shall not be required to take or bring any action or proceeding or any other steps to remove any defect in or objection to title or to fulfill any condition precedent to Purchaser's obligations under this Agreement or to expend any moneys therefor, nor shall Purchaser have any right of action against Seller therefor, at law or in equity.

4.4     Notwithstanding anything in <u>Section 4.3</u> above to the contrary, Purchaser may at any time accept such title as Seller can convey, without reduction of the Purchase Price or any credit or allowance on account thereof or any claim against Seller.  The acceptance of the Deed (as hereinafter defined) by Purchaser shall be deemed to be full performance of, and discharge of, every agreement and obligation on Seller's part to be performed under this Agreement, except for such matters which are expressly stated to survive the Closing hereunder.

4.5     The amount of any unpaid taxes, assessments and water and sewer charges which Seller is obligated to pay, at the option of Seller, be paid by Purchaser out of the balance of the Purchase Price at the Closing, if bills therefor with any interest and penalties thereon figured to said date are furnished to or obtained by the Title Company at the Closing for payment thereof.

4.6     Notwithstanding anything to the contrary contained in this Agreement, the fact that any part of the Property does not have a certificate or certificates of occupancy (or, if there be such certificate or certificates, that there exist any variances between such certificate or certificates and the actual state or use of the Property or there exist any open permit or other notation thereon) shall not be deemed an objection to title or a reason for Purchaser not to close hereunder.

4.7     Notwithstanding the foregoing provisions of this <u>Article 4</u>, all: (i) liens encumbering the Premises, including, but not limited to, judgments and federal, state and municipal tax liens (including the preparation or filing of appropriate satisfaction instruments in connection therewith); (ii) administrative charges  noted or issued against the Premises on or before the Closing Date; (iii) violations that may be removed or satisfied by the payment of a liquidated sum of money not in excess of $75,000.00 ("**Removal Amount**") and (iv) Voluntary Liens (as hereinafter defined); shall be satisfied or discharged by Seller on or prior to the Closing Date.  The term "**Voluntary Liens**", as used herein, shall mean liens and other encumbrances which Seller has knowingly and intentionally placed on the Premises, or with respect to which Seller has taken an affirmative action that directly results in the placement of same against the Premises, including, without limitation, any and all: (a) mechanics' liens and/or materials relating to work performed or alleged to be performed at the Premises and (b) mortgages recorded for money borrowed by Seller.

5.     <u>As Is</u>.

5.1     Except as expressly set forth in this Agreement to the contrary, Purchaser is expressly purchasing the Property in its existing condition "**AS IS, WHERE IS, AND WITH ALL FAULTS**" with respect to all facts, circumstances, conditions and defects, and, Seller has no obligation to determine or correct any such facts, circumstances, conditions or defects or to compensate Purchaser for same.  Seller has specifically bargained for the assumption by Purchaser of all responsibility to investigate the Property, Laws and Regulations, Rights, Facts, Violations and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof.  Purchaser has undertaken all such investigations of the Property, Laws and Regulations, Rights, Facts and Violations as Purchaser deems necessary or appropriate under the circumstances as to the status of the Property and based upon same, Purchaser is and will be relying strictly and solely upon such inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel and officers.  Purchaser is and

will be fully satisfied that the Purchase Price is fair and adequate consideration for the Property and, by reason of all the foregoing, Purchaser assumes the full risk of any loss or damage (subject to <u>Section 11</u> below) occasioned by any fact, circumstance, condition or defect pertaining to the Property.

       5.2     Except as expressly set forth in this Agreement to the contrary, Seller hereby disclaims all warranties of any kind or nature whatsoever (including, without limitation, warranties of habitability and fitness for particular purposes), whether expressed or implied including, without limitation, warranties with respect to the Property.  Except as is expressly set forth in this Agreement to the contrary, Purchaser acknowledges that it is not relying upon any representation of any kind or nature made by Seller, or any of its respective direct or indirect members, partners, shareholders, officers, directors, employees or agents (collectively, the "**<u>Seller Related Parties</u>**") with respect to the Property, and that, in fact, except as expressly set forth in this Agreement to the contrary, no such representations were made.  To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

       5.3     Seller makes no warranty with respect to the presence of Hazardous Materials on, above or beneath the Land (or any parcel in proximity thereto) or in any water on or under the Property.  The Closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined).  As used herein, the term "**<u>Hazardous Materials</u>**" shall mean: (a) those substances included within the definitions of any one or more of the terms "hazardous materials", "hazardous wastes", "hazardous substances", "industrial wastes", and "toxic pollutants", as such terms are defined under the Environmental Laws, or any of them, (b) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (c) natural gas, synthetic gas and any mixtures thereof, (d) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable, (e) polychlorinated biphenyl ("**<u>PCBs</u>**") or PCB-containing materials or fluids, (f) radon, (g) any other hazardous or radioactive substance, material, pollutant, contaminant or waste and (h) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation.  As used herein, the term "**<u>Environmental Laws</u>**" shall mean all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.), the Toxic Substances Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), any

state or local counterpart or equivalent of any of the foregoing, and any federal, state or local transfer of ownership notification or approval statutes.

        5.4    Purchaser shall rely solely upon Purchaser's own knowledge of the Property based on its investigation of the Property and its own inspection of the Property in determining the Property's physical condition.  Purchaser releases Seller, the Seller Related Parties and their respective successors and assigns from and against any and all claims which Purchaser or any party related to or affiliated with Purchaser (each, a "**Purchaser Related Party**") has or may have arising from or related to Section 5.3 hereinabove except as expressly set forth in this Agreement to the contrary, any construction defects, errors or omissions in the design or construction and any environmental conditions and, except as expressly set forth in this Agreement to the contrary, neither Purchaser nor any Purchaser Related Party shall look to Seller, the Seller Related Parties or their respective successors and assigns in connection with the foregoing for any redress or relief. This release shall be given full force and effect according to each of its express terms and provisions, including those relating to unknown and unsuspected claims, damages and causes of action.  To the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order.

        5.5    The provisions of this <u>Section 5</u> shall survive the Closing or the earlier termination of this Agreement and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

      6.    <u>Apportionments.</u>

        6.1    At the Closing, the following items shall be apportioned between the parties as of 11:59 PM on the Closing Date.  Any errors in the apportionments pursuant to this <u>Section 6</u> shall be corrected by appropriate re-adjustment between Seller and Purchaser after the Closing, provided that notice of any such error, with supporting calculations, shall be given by Purchaser to Seller or by Seller to Purchaser, as the case may be, no later than ninety (90) days after the Closing, if ascertainable within such period, it being understood and agreed that if any such items or errors are not ascertainable at the Closing or within ninety (90) days thereafter, the apportionment shall be made subsequent to the Closing when the charge or error is determined but in no event more than twelve (12) months from closing.  Except as otherwise specifically provided for herein, all apportionments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc. and there shall be no other apportionments.  The items to be apportioned are:

        6.1.1    Real estate taxes, business improvement district charges, water and sewer charges and vault charges, if any, and any and all other municipal or governmental assessments of any and every nature levied or imposed upon the Property in respect of the current fiscal year of the applicable taxing authority in which the Closing Date occurs (the "**Current Tax Year**"), on a per diem basis based upon the number of days in the Current Tax Year after the Closing Date (which shall be allocated to Purchaser).  If the Closing shall occur before the tax rate for the Current Tax Year is fixed, the apportionment of real estate taxes shall be upon the basis of the tax rate for the next preceding fiscal period applied to the latest assessed valuation.  Promptly after the new tax rate is fixed for the fiscal period in which the Closing takes place, the apportionment of real estate taxes shall be recomputed.  Upon the Closing Date and subject to the

adjustment provided above, Purchaser shall be responsible for real estate taxes and assessments levied or imposed upon the Property payable in respect of the Current Tax Year and all periods after the Current Tax Year.  In no event shall Seller be charged with or be responsible for any increase in the real estate taxes or assessments levied or imposed upon the Property resulting from the transfer of the Property herein contemplated or from any improvements made or Leases entered into at any time or for any reason.  If any assessments levied or imposed upon the Property are payable in installments, the installment for the Current Tax Year shall be prorated in the manner set forth above and Purchaser hereby assumes the obligation to pay any such installments due after the Closing Date.

6.1.2    Fuel, if any, then stored at the Property on the basis of Seller's last cost therefor, including sales tax, as evidenced by a written current statement of Seller's fuel oil supplier, which statement shall be conclusive as to quantity and cost.

6.1.3    If applicable, utility charges, including, without limitation, electricity, gas, steam, telephone and other utilities, all prorated based upon the most current bill unless actual readings are obtained prior to the Closing Date, in which case such actual readings shall govern.

6.1.4    All other items customarily apportioned in connection with sales of buildings substantially similar to the Buildings in the State and City of New York.

6.2    If there are water meters on the Property, Purchaser shall  furnish readings to a date not more than thirty (30) days prior to the Closing Date, and the unfixed meter charges and the unfixed sewer rents, if any, based thereon for the intervening time shall be apportioned on the basis of such last readings.   Unpaid water meter bills, frontage, sewer charges and assessments shall not be adjusted, nor shall the same be deemed an objection to title, and Purchaser shall take title subject thereto.

6.3    Seller shall not be required or entitled to assign any policies of insurance in respect of the Property to Purchaser, Purchaser shall be responsible for obtaining its own insurance as of the Closing Date, and no adjustment shall be made for any insurance premiums.

6.4    The provisions of this Section 6 shall survive the Closing; provided, however, that any re-prorations or re-apportionments shall be made as and when required under Section 6.1 above.

7.    Representations and Warranties of the Parties; Certain Covenants.

7.1    Seller represents to Purchaser that the following are true and correct as of the date hereof and shall remain true and correct as of the Closing Date:

7.1.1    Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller enforceable against Seller in accordance

with its terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally).

7.1.2    Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively, the "**Code**").

7.1.3    Seller is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of the Office of Foreign Asset Control ("**OFAC**") of the Department of the Treasury (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

7.1.4    Seller is not the subject of any bankruptcy or insolvency proceedings.  Seller has not made an assignment for the benefit of creditors.

7.1.5    This Agreement constitutes, and each document and instrument to be executed and delivered by Seller hereunder (collectively, the "**Seller's Documents**"), when so executed and delivered, shall constitute, the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, covenants and conditions.

7.1.6    Seller is not a party to any service, management, employment or other contract ("**Service Contracts**") affecting the Premises, which are not terminable on or before the Scheduled Closing Date or upon thirty (30) days' notice to the contract vendee thereunder.  Seller shall (i) cause any and all Service Contracts to be terminated as of the Closing Date and (ii) be responsible for any and all costs, fees and/or expenses associated with terminating the Service Contracts prior to Closing.

7.1.7    There are no employees currently employed by Seller at the Premises who will remain employed following the Closing Date.  There are no collective bargaining or union agreements in effect with respect to the Premises.  Seller will not enter into any negotiations or execute any contract with a labor union between the date hereof and the Closing.

7.1.8    All bills and claims for labor performed and materials furnished at the request of Seller, or its officers, agents or employees to or for the benefit of the Premises will be paid in full by Seller on or before the Closing Date.

7.1.9    No person, firm or entity, except for the Purchaser, has any rights in, or rights to purchase or acquire all, or any part of the Premises, including, without limitation, a right of first refusal or option to purchase with respect thereto.

7.1.10    Seller has not received written notice of any pending or threatened condemnation proceedings with respect to the Premises.

7.1.11   Neither the entering into of this Agreement, nor the consummation of the transactions contemplated hereunder, will constitute a violation or breach by Seller of any contract, writ, order, judgment, or other instrument or agreement to which Seller is a party, or to which it is subject to by which any of its assets or properties may be affected, or of any judgment, order, writ, injunction or decree issued against or imposed upon it, or result in a violation of any applicable law, ordinance, rule or regulation of any governmental authority affecting Seller. The execution, delivery and performance of this Agreement by Seller, and the consummation of the transactions contemplated hereby, do not require Seller to obtain any consent, authorization, or approval which has not already been obtained.

7.1.12   Seller (i) is the sole owner of the Premises; (ii) has all requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby (iii) has full power and authority to enter into and perform this Agreement and to enter into the documents to be executed and delivered in accordance with the terms hereof and (iv) has full power and authority to consummate the transactions as contemplated herein.

7.1.13   There are no union contracts or agreements in effect and there are no union workers employed. Seller has had no communications during its ownership with any labor unions or the State or Federal Labor Relations Board.   Seller will not enter into any negotiations or execute any contract with a labor union between contract and closing.

7.1.14   All fixtures and articles of personal property included in this sale are now and at the closing of title will be owned by the Seller, free and clear of any conditional bills of sale, chattel mortgages, security agreements or financing statements or other security interests of any kind.

7.1.15   Seller, to Seller's actual knowledge, has not transferred or agreed to transfer any development or air rights pertaining to the Premises.

7.1.16   No work, labor, services, materials, supplies or equipment has been furnished, or claimed to be furnished, to or for or on behalf of Seller in, upon or about the Premises for which Seller has not made payment in full.

7.1.17   Seller has not received any written notice from a governmental authority notifying Seller of a violation of any law governing hazardous materials, which remains uncured, with respect to the Premises, the Building or the use thereof, and Seller does not have any knowledge of the introduction of any hazardous substances to the Premises or the Building in violation of any law governing such.

7.1.18   Except for the lease between Seller and Pepe Tropical Fruit, Inc., which will be terminated in accordance with the terms herein, there are no leases, licenses or occupancy agreements in effect with respect to the Premises or any portion thereof.   At closing,, the Premises shall be delivered by Seller vacant, fee and clear of any and all tenancies and occupancies.

For all purposes under this Agreement, with respect to any Seller, "knowledge" means the actual then current knowledge of Seligman Rosenberg.

10

7.2     Purchaser represents to Seller that the following are true and correct on the date hereof:

7.2.1   Purchaser is a domestic limited liability company, duly formed and in good standing under the laws of the State of New York and has the requisite power and authority to enter into and to perform the terms of this Agreement.  The execution and delivery of this Agreement and consummation of the transaction contemplated hereby have been duly authorized by all requisite action of Purchaser.  Purchaser is not subject to any law, order, decree, restriction, or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action of Purchaser.  This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Purchaser, when executed and delivered, shall constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor's rights generally).

7.2.2   Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Purchaser to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

7.2.3   There are no judgments, orders, or decrees of any kind against Purchaser unpaid or unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to the best of Purchaser's knowledge, threatened against Purchaser, which would have any material adverse effect on the business or assets or the condition, financial or otherwise, of Purchaser or the ability of Purchaser to consummate the transactions contemplated by this Agreement.

7.2.4   Purchaser is not, and will not become, a person or entity with whom United States persons or entities are restricted or prohibited from doing business under regulations of OFAC (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and will not engage in any dealings or transactions or be otherwise associated with such persons or entities.

7.2.5   Purchaser is not the subject of any bankruptcy or insolvency proceedings.  Purchaser has not made an assignment for the benefit of creditors.

7.2.6   Purchaser is not an employee benefit plan subject to Part 4, Subtitle B, Title I of the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time ("**ERISA**"), nor otherwise a "benefit plan investor" within the meaning of Section 3(42) of ERISA, and Purchaser's assets do not and will not include "plan assets" subject to ERISA or Section 4975 of the Internal Revenue Code of 1986, as amended.  Purchaser is not a "governmental plan" within the meaning of Section 3(32) of ERISA and the funds used by

Purchaser to acquire the Property are not subject to State statutes regulating investments of and fiduciary obligations with respect to governmental plans.

7.3     Purchaser agrees and acknowledges that, except as specifically set forth in this Agreement, neither Seller nor any of the Seller Related Parties nor any agent nor any representative nor any purported agent or representative of Seller or any of the Seller Related Parties have made, and neither Seller nor any of the Seller Related Parties are liable for or bound in any manner by, any express or implied warranties, guaranties, promises, statements, inducements, representations or information pertaining to the Property or any part thereof. Without limiting the generality of the foregoing, Purchaser has not relied on any representations or warranties, and Seller and the Seller Related Parties have not made any representations or warranties other than as expressly set forth herein, in either case express or implied, as to: (a) the current or future real estate tax liabilities, assessments or valuations of the Property, (b) the potential qualification of the Property for any and all benefits conferred by Federal, state or municipal laws, whether for subsidies, special real estate tax treatment, insurance, mortgages, or any other benefits, whether similar or dissimilar to those enumerated, (c) the compliance of the Property, in its current or any future state, with applicable zoning ordinances and the ability to obtain a change in the zoning or a variance with respect to the Property's' non-compliance, if any, with said zoning ordinances, (d) the availability of any financing for the alteration, rehabilitation or operation of the Property from any source, including, but not limited to, any state, city or Federal government or any institutional lender, (e) the current or future use of the Property, including but not limited to the Property's use for residential (including hotel, cooperative or condominium use) or commercial purposes, (f) the present and future condition and operating state of any and all machinery or equipment on the Property and the present or future structural and physical condition of any building or its suitability for rehabilitation or renovation, (g) the ownership or state of title of any personal property on the Property, (h) the presence or absence of any Laws and Regulations or any Violations, (i) the compliance of the Property with any rent control or similar law or regulation and (j) the layout, expenses, operation, agreements, licenses, easements, instruments, documents or contracts of or in any way affecting the Property.  Further, Purchaser acknowledges and agrees that neither Seller nor any of the Seller Related Parties are liable for or bound by (and Purchaser has not relied upon) any verbal or written statements, representations or any other information respecting the Property furnished by Seller, any of the Seller Related Parties or any broker, employee, agent, consultant or other person representing or purportedly representing Seller, any of the Seller Related Parties.  The provisions of this <u>Section 7.3</u> shall survive the Closing or the earlier termination of this Agreement.

7.4     Intentionally Omitted.

7.5     The representations and warranties of Seller contained in <u>Section 7.1</u> shall survive the Closing for thirty (30) days following the Closing Date (the "**<u>Limitation Period</u>**"). Each such representation and warranty shall automatically be null and void and of no further force and effect following the 30th day following the Closing Date unless, on or prior to such 30th day, Purchaser shall have provided Seller with a notice alleging that Seller is in breach of such representation or warranty and specifying in reasonable detail the nature of such breach.  Purchaser shall allow Seller sixty (60) days after its notice within which to cure such breach or if such breach cannot be cured within such sixty (60) day period, and the Seller notifies Purchaser that they wish to extend their cure period (the "**<u>Cure Extension Notice</u>**"), such additional reasonable period of

time as is required to cure the same so long as such cure has been commenced within such sixty (60) day period and is being diligently pursued to completion.  If Seller fails to cure such breach after written notice thereof, Purchaser's sole remedy shall be to commence a legal proceeding against the Seller alleging that Seller has breached such representation or warranty and that Purchaser has suffered actual damages as a result thereof (a "**Proceeding**"), which Proceeding must be commenced, if at all, within sixty (60) days after the expiration of the Limitation Period; provided, however, that if Purchaser gives the Seller written notice of such a breach within the Limitation Period, and the Seller subsequently sends a Cure Extension Notice, then Purchaser shall have until the date which is thirty (30) days after the date the Seller notifies Purchaser they have ceased endeavoring to cure such breach, to commence such Proceeding.  If Purchaser shall have timely commenced a Proceeding and a court of competent jurisdiction shall, pursuant to a final, non-appealable order in connection with such Proceeding, determine that: (a) any Seller was in breach of the applicable representation or warranty as of the date of this Agreement or as of the date of closing, and (b) Purchaser suffered actual damages (the "**Damages**") by reason of such breach and (c) Purchaser did not have actual knowledge of such breach on or prior to the Closing Date and is not deemed to have knowledge of such breach as described in Section 7.6 below, then, Purchaser shall be entitled to receive an amount equal to the Damages in excess of the Threshold Amount but not exceeding the Maximum Liability Amount.  Any such Damages, subject to the limitations contained herein, shall be paid within thirty (30) days following the entry of such final, non-appealable order and delivery of a copy thereof to Seller.  In the event that Seller shall be in breach of any of its representations, Purchaser shall have no recourse to the property or other assets of Seller or any of the other Seller Related Parties, other than the net sale proceeds from the sale of the Property owned by the Seller and Purchaser's sole remedy, in such event, shall be as described above.  As used herein, the term "**Threshold Amount**" shall mean $10,000.00 and the term "**Maximum Liability Amount**" shall mean $50,000.00.

7.6     The representations and warranties of Seller set forth in Section 7.1 are subject to the following limitations: (a) Intentionally Omitted, (b) to the extent that Seller has delivered or made available to Purchaser (or to any Diligence Party (as defined below)) any leases, contracts or other information with respect to the Property at any time prior to the date hereof, and such leases, contracts or other information contain provisions inconsistent with any of such representations and warranties, then such representations and warranties shall be deemed modified to conform to such provisions and Purchaser shall be deemed to have knowledge thereof, (c) Seller shall not be deemed in breach of its representations and warranties contained in Section 7.1 if Seller does not require Purchaser to assume the agreement(s) which violate(s) such representations and warranties or if such representations and warranties are no longer true by reason of the actions of Seller not prohibited by the provisions of Section 19.2 and (d) in the event that, prior to the Closing, Purchaser or any Diligence Party shall obtain knowledge of any information that is contradictory to, and would constitute the basis of a breach of, any representation or warranty or failure to satisfy any condition on the part of Seller, then, promptly thereafter (and, in all events, prior to the Closing), Purchaser shall deliver to Seller notice of such information specifying the representation, warranty or condition to which such information relates, and Purchaser further acknowledges that such representation, warranty or condition will not be deemed breached in the event Purchaser shall have, prior to the Closing, obtained knowledge of any information that is contradictory to such representation or warranty and shall have failed to disclose to Seller as required hereby and Purchaser shall not be entitled to bring any action after the Closing Date based on such representation, warranty or condition.  Without limiting the generality of the foregoing,

13

Purchaser shall be deemed to know that any representation or warranty contained herein is untrue, inaccurate or breached to the extent that: (i) Purchaser or any Diligence Party has knowledge of any fact or information which is inconsistent with such representation or warranty or (ii) this Agreement or any contracts or other information with respect to the Property delivered or made available to Purchaser or any Diligence Party contain provisions inconsistent with any of such representations and warranties. "**Diligence Party**" shall mean any of the following: (A) Purchaser and (B) any direct or indirect officers, directors, employees, agents, consultants, affiliates, attorneys and representatives of Purchaser who were involved in the negotiation of this Agreement, reviewed any leases, contracts or other information relating to the Property, were involved in the preparation of the Diligence Reports or the performance of the due diligence conducted in order to prepare the same, or who otherwise approved the transactions contemplated hereunder. "**Diligence Reports**" mean the results of any examinations, inspections, investigations, tests, studies, analyses, appraisals, evaluations and/or investigations prepared by or for or otherwise obtained by or on behalf of Purchaser in connection with the Property.

8.    <u>Closing Deliveries</u>.

8.1    Seller shall deliver to Purchaser at Closing the following for the Property being sold by Seller:

(a)    A bargain and sale deed without covenants against grantor's acts, in the form attached hereto as <u>Exhibit A</u> and made a part hereof (the "**Deed**"), duly executed and acknowledged by Seller;

(b)    At least fifteen (15) days prior to the Scheduled Closing Date, Seller shall provide Purchaser with a termination of the lease, in the form attached hereto as <u>Exhibit B</u> and made a part hereof (the "**Lease Termination**"), duly executed by Seller and tenant, and simultaneously upon execution thereof, tenant shall have vacated the Property;

(c)    A termination of any service contracts that Seller is a party to that have not been terminated prior to the Closing and all other contracts entered into after the date hereof pursuant to this Agreement;

(d)    A bill of sale, conveying and transferring to Purchaser all right, title and interest of Seller, if any, in and to the Personal Property owned by it, in the form annexed hereto as <u>Exhibit C</u> and made a part hereof, duly executed by Seller; it being expressly understood that no portion of the Purchase Price shall be attributable to such Personal Property;

(e)    The keys and access codes to the Property, to the extent in Seller's possession or control;

(f)    A certificate of non-foreign status, duly executed and acknowledged by Seller, in accordance with Section 1445 of the Code;

(g)    A New York State Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, Form TP-584 for the conveyance of the Property (the "**State Transfer Tax Return**"), duly executed by Seller;

(h)     A New York City Department of Finance Real Property Transfer Tax Return for the conveyance of the Property (the "**City Transfer Tax Return**"), duly executed and acknowledged by Seller;

(i)     A New York State Real Property Transfer Report, Form RP-5217NYC (the "**Transfer Report**"), duly executed by Seller;

(j)     A title affidavit reasonably acceptable to the Title Company;

(k)     Smoke Detector Affidavit executed by Seller; and

(l)     Any other document required to be delivered by Seller at the Closing pursuant to the provisions of this Agreement or reasonably requested by the Title Company in connection with the conveyance of the Property.

8.2     Purchaser shall deliver to the Seller at Closing the following for each Property being purchased by Purchaser:

(a)     The balance of the Purchase Price;

(b)     The State Transfer Tax Return, duly executed by Purchaser;

(c)     The City Transfer Tax Return, duly executed by Purchaser;

(d)     The Transfer Report, duly executed by Purchaser;

(e)     Such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser; and

(f)     Such other instruments, agreements or other documents as may be necessary or convenient to effectuate the provisions of this Agreement.

8.3     Seller shall use commercially reasonable efforts to prepare, no later than two (2) Business Days prior to the Closing, a closing statement (the "**Closing Statement**"), which shall contain Seller's best estimate of the amounts of the items requiring adjustment pursuant to this Agreement.  The amounts set forth on the Closing Statement shall be subject to the reasonable review of Purchaser and shall be the basis upon which the prorations and apportionments provided for in this Agreement shall be made at the Closing.  The Closing Statement shall be binding and conclusive on all parties hereto (absent manifest error) and at the Closing, the Closing Statement shall be executed and delivered by the parties hereto.  Subject to the provisions of <u>Section 6</u> of this Agreement, any errors in the Closing Statement shall be corrected post-Closing.

9.     <u>Conditions to the Closing.</u>

9.1     Notwithstanding anything to the contrary contained herein, the obligation of Seller to close title in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the Closing Date of each of the conditions listed below, provided that

15

Seller, at its election, evidenced by notice delivered to Purchaser at or prior to the Closing, may waive any of such conditions:

9.1.1   Purchaser shall have executed and delivered to Seller all of the documents, shall have paid all sums of money and shall have taken or caused to be taken all of the other action required of Purchaser in this Agreement.

9.1.2   All representations and warranties made by Purchaser in this Agreement shall be true and correct in all material respects as of the Closing Date.

9.2   Notwithstanding anything to the contrary contained herein, the obligation of Purchaser to close title and pay the Purchase Price in accordance with this Agreement is expressly conditioned upon the fulfillment by and as of the Closing Date of each of the conditions listed below, provided that Purchaser, at its election, evidenced by notice delivered to Seller at or prior to the Closing, may waive all or any of such conditions:

9.2.1   Seller shall have executed and delivered to Purchaser all of the documents required to be delivered by Seller at the Closing and shall have taken all other action required of Seller pursuant to this Agreement at the Closing.

9.2.2   All representations and warranties made by Seller in this Agreement shall be true and correct in all material respects as of the Closing Date, except to the extent the facts and circumstances underlying such representations and warranties may have changed as of the Closing.  For purposes hereof, a representation or warranty shall not be deemed to have been breached if the representation or warranty is not true and correct in all material respects as of the Closing Date by reason of changed facts or circumstances which: (i) pursuant to the terms of this Agreement are not prohibited to have occurred or (ii) are not within the control of Seller. Notwithstanding anything to the contrary contained in this Agreement, but subject to the provisions of Section 4.3, in the event of a breach of a representation or warranty by Seller, the Seller shall not be liable for the first $10,000.00 of damages incurred (individually or in the aggregate) by Purchaser as a result of any such breaches and in no event shall Seller be liable for damages in excess of $50,000.00 in the aggregate.

10.   Limitation on Liability of Parties.

10.1   If Purchaser shall default in the performance of Purchaser's obligations under this Agreement and the Closing does not occur as a result thereof (a "**Purchaser Default**"), Seller shall have the right to elect, as its sole and exclusive remedy, upon written notice to Purchaser, to either: (a) terminate this Agreement and the parties hereto shall be released from any further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement or (b) waive Purchaser's Default and proceed to close the transactions contemplated hereby.  SELLER AND PURCHASER AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE DAMAGES WHICH SELLER MAY SUFFER UPON A PURCHASER DEFAULT AND THAT THE DOWNPAYMENT AND ANY INTEREST EARNED THEREON, AS THE CASE MAY BE, REPRESENTS A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT SELLER WOULD SUFFER UPON A PURCHASER DEFAULT.  SUCH LIQUIDATED AND

AGREED DAMAGES ARE NOT INTENDED AS A FORFEITURE OR A PENALTY WITHIN THE MEANING OF APPLICABLE LAW.  If Seller terminates this Agreement pursuant to a right given to it hereunder and Purchaser takes any action which interferes with Seller's ability to sell, exchange, transfer, lease, dispose of or finance all or any portion of the Property or take any other actions with respect thereto (including, without limitation, the filing of any *lis pendens* except in connection with an action seeking specific performance or other form of attachment against any portion of the Property), then the named Purchaser (and any permitted assignee of Purchaser's interest hereunder) shall be liable for all loss, cost, damage, liability or expense (including, without limitation, reasonable attorneys' fees, court costs and disbursements and consequential damages) incurred by Seller by reason of such action to contest by Purchaser.  Notwithstanding the foregoing, none of the above liquidated damages shall be deemed to reduce, waive or limit in any respect the additional obligations of Purchaser to indemnify Seller as provided in this Agreement.

10.2    Subject to the provisions of <u>Section 4.3</u>, if Seller defaults in the performance of Seller's obligations under this Agreement and Purchaser is ready, willing, and able to close in accordance with the terms, provisions and conditions of this Agreement, and the Closing does not occur as a result thereof, Purchaser's sole and exclusive remedy shall be, and Purchaser shall be entitled, to either: (a) terminate this Agreement and receive a prompt refund of its Downpayment whereupon the parties hereto shall be released from any further liability to each other hereunder, except for those obligations and liabilities that are expressly stated to survive termination of this Agreement, (b) seek specific performance of Seller's obligations hereunder, provided that any such action for specific performance must be commenced within thirty (30) days after such default or (c) waive the default and proceed to close the transactions contemplated hereby.  Notwithstanding anything to the contrary contained in this Agreement, in no event whatsoever shall Seller be liable to Purchaser for any damages of any kind whatsoever. Notwithstanding the foregoing, in the event the remedy of specific performance is unavailable due to Seller wrongfully, in default of its obligations hereunder, selling the Property to a party other than Purchaser, Purchaser shall be afforded all rights and remedies available at law and in equity.

11.    <u>Fire or Other Casualty; Condemnation.</u>

11.1    Seller agrees to: (a) maintain: (i) its respective present property insurance policy including fire and extended coverage or (ii) similar insurance coverage and (b) give Purchaser reasonably prompt notice of any fire or other casualty occurring at the Property of which Seller obtains knowledge, between the date hereof and the Closing Date, or of any actual or threatened condemnation of all or any part of the Property of which Seller obtains knowledge.

11.2    If prior to the Closing there shall occur: (a) damage to the Property caused by fire or other casualty which would cost an amount equal to ten percent (10%) of the aggregate Purchase Price or more to repair, with respect to the Premises in the aggregate, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser or (b) a taking by condemnation of any material portion of any Property, then, and in either such event, Purchaser may elect to terminate this Agreement by notice given to Seller within ten (10) days after Seller has given Purchaser the notice referred to in <u>Section 11.1</u> hereof, or at the Closing, whichever is earlier, in which event the Downpayment shall be promptly refunded to Purchaser and this Agreement shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for those obligations and liabilities that are expressly

17

stated to survive termination of this Agreement. If Purchaser does not elect to terminate this Agreement, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and the Seller shall assign to Purchaser at the Closing, by written instrument in form reasonably satisfactory to Purchaser, all of Seller's interest in and to any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, shall deliver to Purchaser any such proceeds or awards actually theretofore paid, less any amounts (the "**Reimbursable Amounts**"): (i) actually and reasonably expended or incurred by Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses) and/or (ii) theretofore actually and reasonably incurred or expended by or for the account of Seller for the cost of any compliance with laws, protective restoration or emergency repairs made by or on behalf of Seller (to the extent Seller has not theretofore been reimbursed by its insurance carriers for such expenditures), and Seller shall pay to Purchaser the amount of the deductible, if any, under Seller's property insurance policy(ies), less all Reimbursable Amounts not received by Seller from any insurance proceeds or condemnation awards paid to Seller prior to the Closing. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

11.3    If, prior to the Closing, there shall occur: (a) damage to the Property caused by fire or other casualty which would cost less than an amount equal to ten percent (10%) of the aggregate Purchase Price to repair, with respect to the Premises, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser or (b) a taking by condemnation of any part of any Property which is not material,, then, and in such event, Purchaser shall not have the right to terminate this Agreement by reason thereof, but the Seller shall assign to Purchaser at the Closing, by written instrument in form and substance reasonably satisfactory to Purchaser, all of Seller's interest in any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, or shall deliver to Purchaser any such proceeds or awards actually theretofore paid, in each case less any Reimbursable Amounts, and Seller shall pay to Purchaser the amount of the deductible, if any, under Seller's property insurance policy(ies), less all Reimbursable Amounts not received by Seller from any insurance proceeds or condemnation awards paid to Seller prior to the Closing. The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.

11.4    Nothing contained in this Section 11 shall be construed to impose upon Seller any obligation to repair any damage or destruction caused by fire or other casualty or condemnation. For purposes of this Section 11, a taking of a material part of any Property shall mean any taking which leaves remaining a balance of such Property which may not be economically operated (after appropriate restoration) for the purpose for which such Property was operated or intended to be operated prior to such taking. If Purchaser does not elect to terminate this Agreement in accordance with Section 11.2, or upon the occurrence of the events set forth in Section 11.3(a) or Section 11.3(b), Seller shall have the exclusive right to negotiate, compromise or contest the obtaining of any insurance proceeds and/or any condemnation awards.

12.    Brokerage. Seller represents and warrants that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of

the transactions contemplated hereby other than Reyes & Elsamad ("**Broker**").  Purchaser represents and warrants that it has not dealt with any broker, consultant, finder or like agent who might be entitled to a commission or compensation on account of introducing the parties hereto, the negotiation or execution of this Agreement or the closing of the transactions contemplated hereby other than Broker.  Purchaser agrees to indemnify and hold harmless Seller from and against all claims, losses, liabilities and expenses, including, without limitation, reasonable attorneys' fees and disbursements caused by or arising out of: (a) a breach of the foregoing representation of Purchaser and (b) any claim made by any broker, consultant, finder or like agent (including, without limitation, Broker) claiming to have dealt with Purchaser.  Seller agrees to indemnify and hold harmless Purchaser from and against all claims, losses, liabilities and expenses, including, without limitation, reasonable attorneys' fees and disbursements caused by or arising out of: (a) a breach of the foregoing representation of Seller and (b) any claim made by any broker, consultant, finder or like agent (including, without limitation, Broker) claiming to have dealt with Seller.  Seller agrees to pay any commission payable to Broker in connection with this transaction pursuant to a separate agreement with Broker.  The provisions of this <u>Section 12</u> shall survive the Closing or the termination of this Agreement.

13. <u>Closings Costs</u>.  At the Closing, Seller shall pay the New York State Real Estate Transfer Tax imposed pursuant to Article 31 and Section 1402 of the New York Tax Law (the "**State Transfer Tax**") and the New York City Real Property Transfer Tax imposed pursuant to Title 11, Chapter 21 of the New York City Administrative Code (the "**City Transfer Tax**"), upon or payable in connection with the transfer of title to the Property owned by it and the recordation of such Deed, which State Transfer Tax and City Transfer Tax shall, at Seller's election, be allowed for out of the Purchase Price and paid by Purchaser on behalf of Seller.  At the Closing, Seller and Purchaser shall each execute, acknowledge (if appropriate) and deliver the State Transfer Tax Return, the City Transfer Tax Return and the Transfer Report to the Title Company or to the appropriate government offices.  All such tax payments shall be made payable directly to the order of the appropriate governmental officer or the Title Company.  Except as otherwise expressly provided to the contrary in this Agreement, Purchaser shall pay: (a) all charges for recording and/or filing the Deed for each Property, (b) all title charges and survey costs, including the premiums on Purchaser's title policy(ies) and (c) all costs and expenses related to Purchaser's financing of its acquisition of the Property.  Seller and Purchaser shall each pay fifty percent (50%) of any escrow fees of the Title Company.  Each of the parties hereto shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation and preparation of this Agreement and the Closing, except as set forth in <u>Section 2.4</u>.  The provisions of this <u>Section 13</u> shall survive the Closing or the termination of this Agreement.

14. <u>Notices</u>.  Except as otherwise provided in this Agreement, all notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "**Notices**") required or permitted to be given hereunder or which are given with respect to this Agreement, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when: (a) personally delivered with signed delivery receipt obtained or (b) upon receipt, when sent by prepaid reputable overnight courier, in each case addressed as follows:

If to Seller, to:

> Ignacio Duarte
> 400 S. Pointe Drive, Apt. 2110
> Miami Beach, FL 33139

with a copy to:

> Hudson Law
> 1010 Summit Avenue
> Union City, NJ 07087
> Attention: Edward J. Mullins, Esq.

If to Purchaser, to:

> 91 Throop LLC
> c/o Jeffrey Zwick & Associates, P.C.
> 266 Broadway, Suite 403
> Brooklyn, New York 11211
> Attention: Daniel Cohen, Esq.

If to Escrow Agent, to:

> Reliable Abstract Co LLC
> 266 Broadway, Suite 301
> Brooklyn, New York 11211
> Attention: Jacob Deckelbaum, Esq.

Personal delivery to a party or to any officer, partner, member, agent or employee of such party at the foregoing addresses shall constitute receipt.  Rejection or other refusal to accept or inability to deliver because of changed address of which no notice has been received shall also constitute receipt.  Notices may be sent by the attorneys for the respective parties and each such notice so served shall have the same force and effect as if sent by such party.  Notices shall be valid only if served in the manner provided in this Section 14.

15.    1031 Exchange.  Upon notice delivered to the other party at least fifteen (15) days prior to the Closing Date, Seller and Purchaser may consummate the sale and purchase of the Property owned by it as part of a so-called like kind exchange ("**Exchange**"; and such party electing an Exchange, the "**1031 Party**"; and the other party not electing an Exchange, the "**Other Party**") pursuant to §1031 of the Code, and such 1031 Party is expressly entitled to assign its rights hereunder to an affiliate of such 1031 Party and/or to a Qualified Intermediary as provided in the Code and the Treasury Regulations promulgated thereunder, on or before the Closing Date, provided that such 1031 Party shall remain liable for all of its obligations under this Agreement, including those which survive Closing.  The Other Party agrees that it shall execute and deliver to such 1031 Party or to the Qualified Intermediary at or prior to the Closing any and all documents reasonably required or requested by such 1031 Party or the Qualified Intermediary to complete such Exchange. The 1031 Party shall, and hereby does, indemnify, and hold the Other Party

20

harmless from, any loss, cost, damages, liability or expense which may arise or which the Other Party may suffer in connection with, an Exchange, including, without limitation, any additional costs incurred by the Other Party in order to consummate the transaction contemplated by this Agreement as a result of the Exchange, which obligation shall survive the Closing.  Seller and Purchaser acknowledge and agree that the Other Party shall in no event be responsible for, or have any liability with respect to, any tax consequences of the 1031 Party as a result of the Exchange.

16.     Assignment.  Purchaser shall neither assign its rights nor delegate its obligations hereunder without obtaining Seller's prior written consent, which consent may be granted or withheld in Seller's sole discretion.  Notwithstanding anything to the contrary contained in this Section 16, Purchaser may assign, at the Closing (and at no time prior thereto), all of its rights and delegate all of its obligations hereunder to any Affiliate (as hereinafter defined) of Purchaser which is under the Control of Purchaser.  In connection with any assignment permitted or consented to hereunder, such assignee shall assume in writing all of the assignor's obligations under this Agreement in form and substance satisfactory to Seller, provided that the Purchaser originally named herein shall not be relieved from its obligations under this Agreement.  Any other purported or attempted assignment or delegation without obtaining Seller's prior written consent or not otherwise permitted hereunder shall be void and of no effect.  For purposes of this Section 16 below, the capitalized term (a) "Affiliate" means any corporation, partnership, joint venture, limited liability company or other entity (i) Controlled by Purchaser or its principals or (ii) in which Purchaser or its principals directly or indirectly owns more than ten percent (10%) of the beneficial interests and (b) "Control" or "Controlled" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the entity in question, whether through the ownership of voting stock, by contract or otherwise.  No consent given by Seller to any transfer or assignment of Purchaser's rights or obligations hereunder shall be construed as a consent to any other transfer or assignment of Purchaser's rights or obligations hereunder.  No transfer or assignment in violation of the provisions hereof shall be valid or enforceable.

17.     Intentionally Omitted.

18.     Tax Proceedings.  From and after the date hereof until the Closing, Seller is hereby authorized to  continue any proceeding or proceedings now pending for the reduction of the assessed valuation of the Property owned by it, and in Seller's sole discretion at their sole cost and expense to litigate or settle same; provided, however, that Purchaser shall be entitled to that portion of any refund relating to the period occurring after the Closing after payment to Seller of all costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Seller in obtaining such refund.  Seller shall not commence any new proceedings without Purchaser's prior written consent.  Purchaser shall deliver to Seller, reasonably promptly after request therefor, receipted tax bills and canceled checks used in payment of such taxes and shall execute any and all consents or other documents, and do any act or thing necessary for the collection of such refund by Seller.  Any refunds or credits due for the periods prior to Purchaser's ownership of the Property shall remain the sole property of Seller.  The provisions of this Section 18 shall survive the Closing.

19.     Intentionally Omitted.

21

20.    <u>Intentionally Omitted</u>.

21.    <u>Further Assurances</u>.  The parties each agree to do such other and further acts and things, and to execute and deliver such instruments and documents (not creating any obligations additional to those otherwise imposed by this Agreement) as either may reasonably request from time to time to effectuate the transactions contemplated hereunder, whether at or after the Closing, in furtherance of the purposes of this Agreement.  The provisions of this <u>Section 21</u> shall survive the Closing or the earlier termination of this Agreement.

22.    <u>Intentionally Omitted</u>.

23.    <u>Escrow</u>.

23.1    Escrow Agent shall hold and disburse the Downpayment in accordance with the following provisions:

23.1.1  Escrow Agent shall deposit the Downpayment in an interest bearing savings account, and shall not be liable for any losses suffered in connection with any such investment.

23.1.2  If the Closing occurs, then Escrow Agent shall deliver the Downpayment to Seller.

23.1.3  If Escrow Agent receives a notice signed by Purchaser stating Seller has willfully and intentionally breached this Agreement, Escrow Agent shall deliver a copy of such notice to Seller.  The Seller shall have the right to object to such request for the Downpayment by notice of objection delivered to and received by Escrow Agent ten (10) days after the date of Escrow Agent's delivery of such copy to the Seller, but not thereafter.  If Escrow Agent shall not have so received a notice of objection from the Seller, Escrow Agent shall deliver the Downpayment to the Purchaser.  If Escrow Agent shall have received a notice of objection from the Seller within the time herein prescribed, Escrow Agent shall, at its sole option, either: (a) deliver to a court of competent jurisdiction the Downpayment or (b) retain the Downpayment until one of the following events shall have occurred: (i) the Seller shall have failed to commence an action in a court of competent jurisdiction against the Purchaser to resolve why the Purchaser shall not be entitled to the payment of the Downpayment within thirty (30) days after delivery of the Purchaser's notice, by serving a summons and complaint on the Purchaser and delivering to Escrow Agent a copy thereof, together with an affidavit of service within such thirty (30) day period, in which event Escrow Agent shall pay over the Downpayment to the Purchaser; (ii) there shall have been served upon Escrow Agent an order or judgment duly entered in a court of competent jurisdiction setting forth the manner in which the Downpayment is to be paid out and delivered, in which event Escrow Agent shall deliver the Downpayment as set forth in such order or judgment or (iii) Seller and Purchaser shall have delivered to Escrow Agent a joint statement executed by both Seller and Purchaser setting forth the manner in which the Downpayment is to be paid out and delivered, in which event Escrow Agent shall deliver the Downpayment as set forth in such statement.  Escrow Agent shall not be or become liable in any way to any person for its refusal to comply with any such requests or demands by Seller and Purchaser until and unless it has received a direction of the nature described above.

23.2     Any notice to Escrow Agent shall be sufficient only if received by Escrow Agent within the applicable time period set forth herein.  All mailings and notices from Escrow Agent to Seller and/or Purchaser, or from Seller and/or Purchaser to Escrow Agent, provided for in this Section 23 shall be addressed to the party to receive such notice at its notice address set forth in Section 14 above (with copies to be similarly sent to the additional persons therein indicated).

23.3     Notwithstanding the foregoing, if Escrow Agent shall have received a notice of objection as provided for in Section 23.1.3 above within the time therein prescribed, or shall have received at any time before actual disbursement of the Downpayment a notice signed by either Seller or Purchaser disputing entitlement to the Downpayment or shall otherwise believe in good faith at any time that a disagreement or dispute has arisen between the parties hereto over entitlement to the Downpayment (whether or not litigation has been instituted), Escrow Agent shall have the right, upon notice to both Seller and Purchaser, (a) to deposit the Downpayment with the Clerk of the Court in which any litigation is pending and/or (b) to take such reasonable affirmative steps as it may, at its option, elect in order to terminate its duties as Escrow Agent, including, without limitation, the depositing of the Downpayment with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party, and thereupon Escrow Agent shall be released of and from all liability hereunder except for any previous gross negligence or willful misconduct.

23.4     Escrow Agent is acting hereunder without charge as an accommodation to Purchaser and Seller, it being understood and agreed that Escrow Agent shall not be liable for any error in judgment or any act done or omitted by it in good faith or pursuant to court order, or for any mistake of fact or law.  Escrow Agent shall not incur any liability in acting upon any document or instrument believed thereby to be genuine.  Escrow Agent is hereby released and exculpated from all liability hereunder, except only for willful misconduct or gross negligence.  Escrow Agent may assume that any person purporting to give it any notice on behalf of any party has been authorized to do so.  Escrow Agent shall not be liable for, and Purchaser and Seller hereby jointly and severally agree to indemnify Escrow Agent against, any loss, liability or expense, including reasonable attorneys' fees (either paid to retained attorneys or representing the fair value of legal services rendered by Escrow Agent to itself), arising out of any dispute under this Agreement, including the cost and expense of defending itself against any claim arising hereunder.  The provisions of this Section 23 shall survive the termination of this Agreement.

24.     Miscellaneous.

24.1     Except as otherwise expressly set forth in this Agreement, the provisions of this Agreement shall not survive the Closing.

24.2     This Agreement shall be governed by, interpreted under, and construed and enforced in accordance with, the laws of the State of New York.

24.3     This Agreement may be executed in counterparts, each of which shall be deemed an original.

24.4   The captions are for convenience of reference only and shall not affect the construction to be given any of the provisions hereof.

24.5   This Agreement (including all schedules and exhibits annexed hereto), contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings, if any, with respect thereto.

24.6   This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged.

24.7   The parties do not intend to confer any benefit hereunder on any person, firm or corporation other than the parties hereto.

24.8   No waiver of any breach of any agreement or provision herein contained shall be deemed a waiver of any preceding or succeeding breach thereof or of any other agreement or provision herein contained.  No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

24.9   The parties hereto agree that neither this Agreement nor any memorandum or notice hereof shall be recorded.  Any breach of the provisions of this Section 24.9 shall constitute a default by Purchaser under this Agreement.  Except in connection with an action seeking specific performance, Purchaser agrees not to file any lis pendens or other instrument against all or a portion of the Premises in connection herewith.  In furtherance of the foregoing, Purchaser: (a) acknowledges that the filing of a lis pendens (except in connection with an action for specific performance) or other evidence of Purchaser's rights or the existence of this Agreement against all or a portion of the Premises could cause significant monetary and other damages to Seller and (b) hereby agrees to indemnify Seller from and against any and all claims, losses, liabilities and expenses (including, without limitation, reasonable attorneys' fees incurred in the enforcement of the foregoing indemnification obligation) arising out of the breach by Purchaser of any of its obligations under this Section 24.9.

24.10   All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the parties may require.  If Purchaser consists of two or more parties, the liabilities of such parties shall be joint and several.

24.11   As used herein, the term "**Business Day**" means any day of the year on which banks are not required or authorized by law to close in New York City.

24.12   This Agreement shall bind and inure to the benefit of Seller, Purchaser and their respective permitted successors and assigns.

24.13   This Agreement may be executed and delivered by facsimile or email transmission of pdf counterparts and such transmission of the Agreement shall be treated as an original.

24.14   Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such invalidity or

unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

24.15   If any action is brought by either party against the other in connection with or arising out of this Agreement or any of the documents and instruments delivered in connection herewith or in connection with the transactions contemplated hereby, the prevailing party shall be entitled to recover from the other party reasonable attorneys' fees and expenses incurred in connection with the prosecution or defense of such action.

24.16   (a) Any legal action or proceeding with respect to this Agreement shall be brought in a Federal or state court of competent jurisdiction sitting in the City, County and State of New York (including the appellate courts thereof) (each, a "**New York Court**") and by execution and delivery of this Agreement, each party to this Agreement hereby accepts, generally and unconditionally, the jurisdiction of the New York Courts.  Each party to this Agreement hereby expressly and irrevocably submits the person of such party to this Agreement to the in personam jurisdiction of the New York Courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to this Agreement.  To the extent permitted under applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Agreement or as otherwise permitted by law, shall be necessary in order to confer jurisdiction upon the person of such party to this Agreement in any such New York Court.

(b)      To the fullest extent permitted under applicable law, each party to this Agreement irrevocably waives and agrees not to assert, by way of motion, as a defense or otherwise, any objection which it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in a New York Court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum, any claim that it is not personally subject to the jurisdiction of any such New York Court or that this Agreement or the subject matter hereof may not be enforced in or by such New York Court.

24.17   SELLER AND PURCHASER HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER ARISING IN TORT OR CONTRACT) BROUGHT BY SUCH PARTY AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANYWAY CONNECTED WITH THIS AGREEMENT.

24.18   To the extent applicable, all of the foregoing provisions of this Section 24 shall survive the Closing or the earlier termination of this Agreement.

25.      Limitation of Liability.  Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed that none of the employees, directors, officers, members, partners, managers, principals, consultants, shareholders, advisors, attorneys, or agents of Seller, or any other person or entity, shall have any personal liability or obligation whatsoever for obligations entered into by or on behalf of Seller, including, without limitation, any obligations under this Agreement or under any documents delivered at Closing, and the individual assets of such parties shall not be subject to any claims of any person relating to such obligations.

Notwithstanding anything to the contrary contained in this Agreement, it is understood and agreed that none of the employees, directors, officers, members, partners, managers, principals, consultants, shareholders, advisors, attorneys or agents of Purchaser, or any other person, shall have any personal liability or obligation whatsoever for any obligations under this Agreement or under any documents delivered at Closing, and the individual assets of such parties shall not be subject to any claims of any person relating to such obligations.  However, the foregoing shall not in any way limit the parties' obligations and liabilities under this Agreement.  The provisions of this Section 25 shall survive the Closing or any early termination of this Agreement.

26.    Time of the Essence.  The parties hereto acknowledge and agree that, except as otherwise expressly provided in this Agreement, **TIME IS OF THE ESSENCE** for the performance of all actions (including, without limitation, the giving of notices, the delivery of documents and the funding of money) required or permitted to be taken under this Agreement.  Whenever action must be taken (including, without limitation, the giving of notice, the delivery of documents or the funding of money) under this Agreement, prior to the expiration of, by no later than or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 4:00 p.m. (New York Time) on such date, provided that such action must be completed by 3:00 p.m. (New York Time) with respect to the payment of the balance of the Purchase Price and other payments by Purchaser on the Closing Date.  However, notwithstanding anything to the contrary herein, whenever action must be taken (including, without limitation, the giving of Notice, the delivery of documents or the funding of money) under this Agreement prior to the expiration of, by no later than or on a particular date that is not a Business Day, then such date shall be extended until the immediately following Business Day.

27.    No Offer.  This Agreement shall not be deemed an offer or binding upon Seller or Purchaser until this Agreement is fully executed and delivered by Seller and Purchaser.

28.    Access.  Purchaser shall be permitted to have reasonable access to the Premises from time to time, between the date of this Agreement and the Closing Date, during business hours and upon reasonable prior notice to Seller.  Such access shall be under the supervision of Seller or Seller's real estate broker, and shall be conducted in a manner which shall not interfere, in any material respect, with the business operations being conducted in the Premises.

29.    Mortgage Assignment.  To the extent the Premises is encumbered by a mortgage and at Purchaser's sole cost and expense, including reasonable attorneys' fees, Seller shall request that the holder of the existing mortgage which encumbers the Premises, assigns the existing mortgage to Purchaser's lender and delivers in conjunction with such assignment all documents necessary to effectuate the completion of the assignment.  Seller shall use commercially reasonable efforts to cooperate with the Purchaser to have Purchaser's lender receive the assignment of the existing mortgage; provided, however, in no event shall Seller's lender's refusal or non-responsiveness to Seller's reasonable requests to assign the existing mortgage permit Purchaser to: (a) delay, postpone or extend the closing or (b) terminate this Agreement.

30.    A facsimile, "pdf" and/or electronic copy of a signed original counterpart of this Agreement shall be deemed sufficient to bind the parties, and shall be deemed an original for all purposes.  This Agreement may be executed in any number of counterparts, each of which shall be

deemed an original, and all of which, when combined, shall constitute one (1) fully executed original document.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

**SELLER:**

*Ricardo Duarte* Roanena Duarte as Power of Attorny
IGNACIO DUARTE

[signatures continue on following page]

**PURCHASER:**

**91 THROOP LLC**

By: _____
Name: David Goldwasser
Title: Authorized Signatory

**ESCROW AGENT:**

SOLELY FOR THE PURPOSES OF
CONFIRMING THE PROVISIONS OF
SECTION 23:

RELIABLE ABSTRACT CO LLC

By:_____
Name:
Title:

**PURCHASER:**

**91 THROOP LLC**

By: _____

Name: David Colm

Title: Authorized Signatory

**ESCROW AGENT:**

SOLELY FOR THE PURPOSES OF CONFIRMING THE PROVISIONS OF SECTION 23:

RELIABLE ABSTRACT CO LLC

By: _____

Name:

Title:

SCHEDULE A

LAND

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Northeasterly side of Throop Avenue distant 25 feet Southeasterly from the corner formed by the intersection of the Northeasterly side of Throop Avenue with the Southeasterly side of Bartlett Street;

RUNNING THENCE Northeasterly parallel with Bartlett Street 95 feet;

THENCE Southeasterly parallel with Throop Avenue 75 feet;

THENCE Southwesterly parallel with Bartlett Street 95 feet to the Northeasterly side of Throop Avenue;

THENCE Northwesterly along the Northeasterly side of Throop Avenue 75 feet to the point or place of BEGINNING.